I'm Keith Scully of Gendler and Mann, on behalf of Appellant Glenn Milner. Also present with me is David Mann. Mr. Milner is seated in the back of the courtroom. Are you going to divide the argument? No, I'd like to reserve seven minutes. But the two of you are not going to divide? No, that just makes things confusing. We are asking this court to reverse a decision of the Western District of Washington holding that the Navy was entitled to exempt from disclosure under the Freedom of Information Act certain documents requested by Mr. Milner. The documents in question were ESQD ARC maps, Explosive Safety Quantity Distance maps, which are measurements of how far a blast would go if an explosive or other piece of ordnance happened to detonate, in this case at the Navy's naval magazine, Indian Island. Now, this also might detonate not only as the ammunition is currently being stored, but the ammunition either comes onto the island or leaves the island, so it could detonate, I guess, during the process of loading onto a ship or unloading from a ship. The maps in question cover the storage bunkers and the ordnance wharf, which is the location where ships are loaded and unloaded, as well as a scuttling site, which is where the Navy has picked in the sound to tow a burning ship. I read the reference to that scuttling site. Where is it? We don't know. The Navy keeps it secret. So that's one of the things we'd like to know. If you happen to be boating, should you draw a really wide swath around that particular location, or are you, in fact, in the safe part of the sound? So one of the things you're requesting is not only these ARC maps, but also the scuttling site? The ARC maps will show the scuttling site. There will be explosive ARCs at the scuttling site, and we'll then know on this particular— Does it matter what you want to do with the information? Is that really relevant to our consideration? No. It makes no difference. FOIA is structured so that citizens decide what they want. Does it make some difference as to what somebody else might do with the information? That's where I'm going with it. Thank you, Judge Fletcher. That was my next question. Do we need to care about what someone with less benign intent might do with this information? Congress has created exemptions for information that people with less benign intent might misuse. It's Exemption 1, national security, and Exemption 3, which allows Congress to separately shield whole categories. But there are other exemptions, too. I mean, it doesn't have to be classified or top-secret information to make it sensitive. And the concern that the government is raising, and frankly one I share, is that this is the kind of information which, if it fell into the wrong hands, could do great damage and kill people. Some exemptions allow the district court to do a balancing test. Some of the parts of Exemption 7, which are the law enforcement exemption. Well, can't we affirm on any basis supported by the record without regard to the exemption that the district court relied on? Yes, but in order to get to a balancing test, we have to be within an exemption in the first place. And our argument is that the two exemptions the Navy has relied on, Exemption 2 and Exemption 7-F, require a threshold showing that this information be law enforcement related. If they think there's general public safety concerns, they can and in fact have to classify. As I read Commander Whitbread's declaration, it's more than just a general safety concern. It's a concern with regard to information falling into the hands of people who might have designs on the magazine that would include sabotage or acts of terrorism. And those concerns are addressed by Exemption 1. And I think it's interesting to note that the Navy has pointedly not classified these documents. I have to say that when I was a naval officer doing part of my ill-spent youth, and I had occasion to read an awful lot of classified material, I see absolutely no reason why the government could not classify this if it chose to do so. I mean, the government would classify the name of the commanding officer's dog. Right. Yeah, that's absolutely right. And it has happened before. I'm not quite sure I share such a... The problem when, as I understand it, when the law, when you classify something, is it restricts who can receive the information. And there's a category of people here that may very well need this information, and that is the emergency responders and the law enforcement authorities who would be involved in responding to a detonation, whether accidental or otherwise. And when you classify something, it makes it very hard for people who do not have an appropriate security clearance to get that information. And that's a very practical problem that exists in this case, doesn't it? If a fire breaks out at Indian Island, right now the firefighters know how far they should stay to be safe. And just the firefighters at Indian Island that would be involved, depending upon the size of the detonation. Right. The firefighters know, but the civilians don't. And if you or I are driving past there, we have no means of knowing how far we have to go. I'm not referring specifically to the neighbors in the surrounding neighborhood. I'm referring to other emergency responders who would be called in for mutual aid purposes to respond to the emergency, to put out fires and deal with casualties and cordon off the area and do all the things that emergency responders would have to do if we had an incident like that. And those people absolutely have to know, but so too do the neighbors. But if you start classifying things, it makes it very hard for the people who need to know to have that information. We're going to have to do background checks on the fire chief at Port Townsend and everybody else in the fire department that needs to have that information. And that's not easily done, counsel. If it needs to be widely disseminated, then it needs to be broadly disseminated. Everyone who wants to know should know. If you're opening this up to the entire universe of emergency responders, then what happened in this case will happen. The newspaper will get it. The previous version of this map was published in the local paper, even though the Navy tried to restrict it under this ad hoc reading of exemptions. But it wasn't classified at that point, was it? No, that's right. So if it's really dangerous, classify it. If it's not dangerous, then you shouldn't be able to pick and choose which individuals know to be safe and which don't. If that's the case, then how do you distinguish the precedent involving ATF raid manuals and other non-classified internal documents that we have held are exempt from FOIA production? Exemption to, in this circuit, is limited to law enforcement materials. Well, you know, that's what Hardy says. I have trouble with Hardy, I have to say, if that's how we have to read Hardy, because it seems so odd when you compare it to the language. I don't know whether we're allowed to go away from Hardy and say, well, that was, in fact, law enforcement material, and that holding necessarily involved law enforcement material. But could we say more broadly, for example, that we might adopt something like the Crooker test out of D.C.? Could you address that possibility that if Hardy is not, let's say, Hardy is correct on its facts, it involves law enforcement material, and so on. But Crooker may be consistent with, and let's assume for the moment that we're applying the D.C. Circuit's test out of Crooker. What do we do with that? Well, I actually heard two questions. One is, can you expand beyond law enforcement? And two, if Crooker is applied, do we lose? And the answer to both of those questions is, well, the answer to the first question is, you have to overrule Hardy. It's followed up by Dirksen. It's followed up by Maricopa Audubon. Yeah, what about that Gosok case? They didn't seem to pay much attention to the law enforcement part of that. That's the tenth circuit. No, no. I'm sorry. The Maricopa case. Yeah, that's Spotted Owl. Gosok was the tenth circuit. Ours was Spotted Owl. Nesting sites. Nesting sites. That's right. Spotted Owl and nesting sites. So may I answer the Crooker question first, and then I'll come back to that follow-on question? The answer under Crooker is, one, that is not the law of the circuit, and you would have to overrule Hardy and Dirksen and Maricopa Audubon to get there. But why can't we interpret Hardy to mean predominantly internal sensitive records of the agency? How is that inconsistent with Hardy's characterization of the materials, in that case as law enforcement materials? So Hardy flat out says law enforcement. The case which is actually controlling that question is Maricopa Audubon, wherein you looked at documents which were clearly not law enforcement, you held they were not law enforcement, and you then held that they were therefore not within the ambit of Exemption 2. The Navy argues there's one line in Maricopa Audubon which says that it's not covered by law enforcement or other reasons. The only logical reading of that is either law enforcement or the trivial materials that the Supreme Court has held also fall within Exemption 2. But the closest the Navy can come to finding a case within this circuit that supports broader than law enforcement is that slender read of other exceptions. It simply is not the law of the circuit that the high two reading of FOIA is broad beyond law enforcement. I got it. Now, assume that we disagree. I'll listen to Judge Fletcher first, then I have a question. Go ahead, Judge Gould. Here's my question. Let's assume that we think we can distinguish Hardy and do what makes sense. Why would it not make sense to apply the Crooker test? Because it's… That's where I'm leaning right now, that I think Hardy doesn't constrain us and that it would rather than proliferate different standards, that we should kind of get on the bandwagon of the test stated in Crooker and then let you tell us how that test should be applied here. Well, even under Crooker, these maps still need to be disclosed. The test under Crooker is whether they are predominantly internal, and these maps were created for construction and safety reasons. They're given to… Why isn't that internal, though? I mean, that tells the contractor how far to separate the magazines from one another, and it tells the people who handle munitions at the dock or at the depot that this is where you put these things and how you keep them apart so that we don't have problems if you drop one of them and it explodes. It also tells you how far away from these things you need to stay. That's one of the purposes of this. Let me ask you this. Do the fire department personnel in Port Townsend have this information? They did in 2006 when we first started the FOIA request. I assume they have updated maps, but I don't know. And they had been given this by the Navy? The local emergency responders were given it by the Navy. A politician was given it. And they had been not given to it pursuant to FOIA. The Navy had simply given it to them because they thought it would be useful for them to know that information. That is my understanding, although I have not seen any correspondence from the Navy to the fire department. As to why? But we know the what? That is to say we do know that they had it? That's right. It's a hard argument to make, then, that it's primarily internal if the Navy is voluntarily giving it over to the fire personnel and to the local politician. That's absolutely right. And the reason they've given it to them is that this information tells you how far outside of the facility the blast goes. But how is that different, Counsel, from the case involving the Health and Human Services audit function where we gave directions from HHS to Blue Cross in order to process claims, and we didn't want that information given to the health care providers because it might help aid in engaging in fraudulent billing? That's Dirksen. And the difference there is that's law enforcement information. That tells people when HHS is going to audit you. But the problem, though, to address Judge Fletcher's concern is that's not information that is restricted solely within the confines of the Health and Human Services Department. It includes sharing that information with people at Blue Cross Blue Shield who process claims. Those are private contractors who are doing a government function. There's other cases with that. There's L.A. Times v. The Army, which is private security contractors. Does it make a difference that maybe the Navy has a memorandum of understanding with the Port Townsend Fire Department to come and respond to help put out a fire if we have a detonation on the base? No. Does that make them akin to Blue Cross contractors? No, because the nature of this information, how far outside a blast goes, is inherently not internal. Whereas audit guidelines, what do you do when you sit down at your desk on Monday, that is inherently. . . But getting back to the standard and quicker, assuming we end up there, you know, it seems like the fact that the fire persons have this, in my mind, would just relate to whether it's primarily internal. It wouldn't per se mean it's not primarily internal if certain people have it. You'd have to look at who's got it overall and what percentage of the distribution is internal. I'm not sure the Kirker test is a numerical test of the type of people who have it. I think you look at the nature of the information rather than the number of people who get it or even the categories of people who get it. This internal business does impact on what, in some sense, we don't look at. That is to say, it is, I understand, irrelevant why somebody wants something under FOIA. And the reason that we have that rule is people want stuff for all kinds of quirky reasons, some of which a judge might agree with are very important, some are totally trivial, but FOIA doesn't get into that in the sense of, listen, if it's a trivial reason but you're entitled to it, you're entitled to it because you can waste your money getting stuff for trivial purposes. But if we're talking about primarily internal or external, I think we do get back into what is the relevance of this information to people outside of the Navy. So not only relevant to the firefighter personnel, but relevant to boaters who are risk-averse, relevant to people who want to decide whether or not they want to live in Port Townsend, relevant to people who may want to decide whether to pressure the Navy to move the ammunition somewhere else. I mean, so the primarily internal proposition invites us to decide or invites us to consider, say it that way, what impacts this information has outside the internal processes. That's right. I mean, if there is a legitimate reason for people outside of the Navy to ask this, it is a key indicator that it is not predominantly internal. And I'd like to point out that we're just talking about internal or external, but it not only has to be internal, it has to be personnel. The D.C. Circuit has not abandoned that word out of FOIA. So that's odd. Exception two is odd. It says personnel matters and practices. And you're suggesting, and I think most courts have done this, that personnel applies to practices as well as to matters. The exact wording is internal personnel rules and practices. Rules and practices. And I don't think there is a single case which holds that practices is a separate concept from personnel rules. Personnel practices. I have Ninth Circuit presynthesis. Practices is modified by personnel. That's right. As to whether it's primarily internal, I'm not sure I would tend to agree that you would just look at the relevance in the sense of what other people, non-internal people, might like to see it. I don't think there's just a numerical test for primarily, but it might have something to do with what the Navy's purposes are. Does the Navy have it primarily to inform their own judgment, with an exception, to inform first responders? So it's primarily for their own purposes? Or does the Navy have it primarily for something other than internal purposes? What's wrong with that analysis or way of looking at it? Well, the Navy has a laundry list of reasons why they have these things. Some of them are predominantly internal. Others of them are clearly external. If we're weighing sort of what the Navy uses by percentage of time or items on the list, then we're back to the numerical test. And the overall problem with Crooker is that it leaves it up to the Navy to decide what they haven't chosen to release, they do release. If you create the test being, if you keep it within the bounds of the base, then you don't have to give it out, then all the Navy has to do to keep something secret, for a good or a bad reason, is not ever send it outside. If the test is it is predominantly internal. But that test doesn't make any sense, given the nature of the information and the problem that we're trying to address. If there is an explosion at this depot, it is by definition going to have to involve emergency responders from outside the base. There may not be any emergency responders on the base left after the explosion. So I'm not sure that your analysis helps us much in deciding whether the Navy would have a legitimate reason to give this information to those with a need to know, because they're going to have to act on it at some point in the future in an emergency. We're arguing that you should not adopt the Crooker test, because I don't think it does make sense. I don't think this discourse reaches a rule that makes sense. What we have in this circuit is a much brighter line rule, a test as to whether it is law enforcement. And we argue, and we may argue on Bonk, that even that test is far too fuzzy and requires far too much. But if we don't want to give ATF raid manuals to people who might be criminals, why would we want to give information to people who might be terrorists to use it against us? Well, but the evidence that they could use it against us is a speculative slight risk. I've got to give a substantial amount of deference to the commanding officer of the depot when he tells me that he's got a concern that if this information falls into the wrong hands, we've got a problem. Well, he tells you that in his expertise it could be used to target a specific ammunition store, and you'd know what you were hitting. But what that information means in terms of risk, I don't think he's entitled to deference. As to whether there is a realistic risk that that slight little nugget of information so increases the risk to the facility, that's a question. Why don't we let you sit down? You've run over. Thank you. And we'll give you a chance to respond. Thank you. May I please the court? I'm Peter Wynn on behalf of the United States. The question presented here, as the court has noted, is whether these arc maps which were created for safety purposes with respect to the magazine at Naval Island, Indian Island, are protected from the FOIA's mandatory public disclosure provisions under Exemption 2. We also have the Exemption 7F argument, but I'll try to focus in on the Exemption 2 question, because that seems to be where the court has the most concerns. The statute we're working with here references matters that are related solely to the internal personnel rules and practices of an agency. The Supreme Court in Rose interpreted... Now, the word solely, interesting. How does Crooker move from solely to predominantly? I think the Crooker decision is highly informative in terms of how the court struggled through that interpretation. They looked at the notion of related, and then they looked at the word solely, and it's quoted in our brief, but they basically say if you focus on one word solely, you end up with nothing, because anything potentially could be related to things outside the agency. If you focus on related, it could take anything that's internal and shut it down. So what they ended up parsing that statute with was the word predominantly, predominantly internal. Let me ask you this. I'm having trouble with what personnel means in that Section 2 exemption. An easy reading of personnel seems to me the reading that comes out of the Senate report, which is, you know, personnel matters, hiring, firing, discipline, those sorts of things. And the only case we've got out of the Supreme Court that's very helpful is Rose, which leans toward the Senate definition, although it seems a little broader than that. It seems to be... And certainly the lower court case laws move broader than that, so we've got sort of personnel operations manuals, like if I'm an ATF guy and I'm being told how to conduct my operations, that seems now to be personnel within the meaning of 2. And there's a qualification written into Rose that says, well, and obviously, I don't see how it's obvious from the statute, but the Supreme Court says it's obvious, so therefore I guess it's obvious, that it's protected from exemption to the degree that the information might help somebody defeat the operation of that particular personnel and so on. Why is this... Why are these ARC maps, like personnel manuals that direct an auditor, that direct an ATF agent out doing investigations in the field or whatever, why are these personnel matters at all? Well, they're going to be... They certainly relate to personnel practices in the sense that, as well as personnel rules, there may be regulations that are in the record dealing with how these explosives are supposed to be handled. And why are they personnel? Here's my problem. It's like all these words that if you take them to their outer extreme, they become... They kind of lose their operational sense or meaning. If any rule applies to people and applies to personnel and tells them what to do, but if that's the meaning of personnel, that means that they didn't even need the word personnel. That is to say, all they needed to do was say agency rules and practices. Do you follow me? I do. So why is this personnel within the meaning of exception to? Well, I think that if you look at the way courts have interpreted that language, courts have interpreted that language to pick up the type of internal regulatory behavior that agencies engage in to tell their employees how to behave with respect to matters that really are within the agency's own sort of how are we going to run our business. The way the court in Hardy tried to parse that language is very instructive because they distinguish that concept of the internal process. In that case, they're looking at law enforcement matters as opposed to administrative activities, which are other directed, which are where the agency's involved in bossing people around or the agency's involved in activities that would intentionally affect the general public. Here we have a situation where the Navy's engaged with these art maps is predominantly managing a base, which is restricted from the general public where the highly explosive materials are being maintained and transported and temporarily stored in a way that's safe and protects the essential business and mission of the Navy. Let me ask you, this is in a sense irrelevant, but I don't think it's quite irrelevant for the reason of what's internal, external, and so on. We're familiar with these tragic ammunition loading accidents. There's one that I know well from the history in the Bay Area where I now live, Port Chicago, 300 people killed in an ammunition ship being loaded. The Halifax, 2,000 people killed in a 1917 ammunition ship in Halifax Harbor. I mean, this is dangerous stuff, as the Navy itself well knows and is very careful to do what it can to reduce the dangers. I have trouble seeing how this can be something that is purely or predominantly internal than when it has such enormous consequence for the civilians or such potentially enormous consequence for the civilians surrounding the ammunition depot. Well, the record shows that the arc maps in this case do not touch civilian-owned property. They do extend out into the base. I mean, out into the navigable water. And in fact, I know that harbor fairly well. There's a lot of boating that goes on in that harbor. That's right, and that is the principal focus of the plaintiff's case is to focus on the consequences should there be, God forbid, a catastrophe. And I want to make sure that I emphasize the degree to which I know that the Navy is trying at its utmost to be careful with this material. This is in no way a suggestion that the Navy is being careless. Right, and I don't think that the plaintiff has made any such suggestion here. This is not a case where a matter which is, as the court correctly points out, is a matter of legitimate public concern, is something that involves the traditional reasons why that policy is so strongly protected by the FOIA, which is government oversight, oversight of really making sure that the government's doing what they're supposed to do, and also to make sure that the citizens are aware of how the government's direct activity could affect their lives. This is a situation where we would respectfully submit that there is a matter of legitimate public concern, but as the Supreme Court noted in Rose, and as this court has also noted in the development of the High 2 exemption under the FOIA, and certainly as the D.C. Circuit that has a tremendous amount of experience in this area has noted, there are circumstances where matters can be certainly a matter of genuine public concern, but also the risks attendant upon the disclosure of that information are so great that it's not in the public interest to disclose that information so someone of ill will could use it to attack the naval base or to, you know, in some of these cases. So what additional information would a malefactor get if these ARC maps were revealed? It's public knowledge that ammunition is stored on the depot. It's public knowledge. I mean, you just look at the buildings. What additional information are they going to get that poses additional threats beyond that which is already publicly known? Good. Good question. First of all, not all the structures on the island house explosives. So some of them house people. Some of them house explosives. Some of them house safety equipment and fire equipment. And so one thing that will... And is that a secret which ones house explosives and which ones do not? I don't think it's a matter of public knowledge which are which. Is it readily observable if somebody wants to pay attention? I don't know the answer to that question. Let me make two other points about why it matters. There are different levels of explosives in different locations on the island. I think it's a matter of public knowledge that there are Tomahawk missiles on the island that have quite a large ARC map and other items which have a relatively smaller ARC map. What these things are going to tell you is where to target your attack to get the Tomahawks. The third reason is that these ARC maps overlap. That's just in the nature of handling explosives, you're going to have a certain amount of overlap in those ARC maps. So what the ARC map knowledge will tell a terrorist or tell a saboteur or someone, an enemy that's on attacking the base, is if you want to start a chain reaction, you can target your attack in such a way that you will not only hit that particular storage depot, but you will create exactly the type of catastrophe through a chain reaction that we're all seeking to avoid. Those are the three reasons why it matters. Fair response. Now, we're told that these ARC maps are now in fact public knowledge. Is that right? No, that's incorrect. There's only one map for the island that has been disclosed. That was not really an ARC map. I mean, if you look at the record, Officer Smith, who testified about that particular item, and the map itself is in the record at 65, that is a compilation of just the exterior of these things. It's just showing the extent to which out into the bay a catastrophic explosion would extend. And that's important for the first responders, obviously, because that does in fact potentially affect the public interest. But most of these maps are internal. So that's the worst case scenario? That's my understanding, yes, Your Honor. Okay. Maybe the other side will tell us differently in terms of what's now in the public domain. But that's not technically the ARC map. What the fight here is over is not that document, because that document wasn't even included in this when we went through and identified the documents that were responsive to the request. The 81 documents we're fighting over are ARC maps for individual sites, and those are far more sensitive than just the sort of general question. And that information has not yet been revealed? None of that information has been disclosed. So no one outside the Navy except maybe the first responders knows that information? And the record is simply silent on the question whether any first responders have been provided with that information. Although I do want to say something about the question the court asked during Plaintiff's talk. There was a concern about the effect of the disclosure of this information on non-Naval personnel. Does this somehow make it not internal? Or does it somehow waive a FOIA exemption? DEA manuals that are involved in Hardy are disclosed to state and local law enforcement agencies. They are also disclosed to foreign governments. And that's reflected in other FOIA exemptions, including the Reporters Committee for Freedom of the Press. Now, obviously, that's not Exemption 2, but that's Exemption 7F, I believe. But in that case, the RAF sheets were broadly disclosed among different law enforcement agencies. So the fact that FOIA material is shared under conditions of confidentiality does not itself waive a FOIA exemption. Sure. Could you address the question as to, I mean, if this information as to where the particular explosives are stored within the base is so important and is so potentially devastating in the hands of a terrorist, why isn't this classified information? Well, the logistical problems of classification make it very, very difficult to work with this material. What logistical problems are you referring to? For instance, not all servicemen have the right levels of classification requirements. Certainly, public responders may or may not be able to qualify for this. You just told me you don't know whether public responders know or don't know where they are. Well, that's true. You're asking me to assume. Focusing. Let me stop and then you can talk. You're asking me to assume that the public responders do not know, or you're just saying it's not on the record. It's not on the record, so we don't know. So you can't tell me whether they do or they don't. That is correct. So let's just focus on the naval personnel that need to have access to it and the logistics of making sure everyone has the appropriate level of classification rights of access to it creates a problem. There are also various problems of managing the information. I'm going to stop you to make sure I understand. Meaning that if this were classified material, the people working on the base with the materials would have to have security clearance. They would have to have security clearance, and to some extent they have to manage the information in a way that's different from, I mean, depending on the level of classification, potentially you could have everybody having to run into a skiff before they can actually figure out whether or not they need to stay away from it. But in terms of protecting it under FOIA, all you need is confidential, correct? You don't need secret or top secret or level Q or anything else. You just need confidential. I think you could do it that way. Yeah. And confidential is a pretty low level. But the exemption requirements under the FOIA Exemption 2, I mean, obviously if you look at the Dirksen case, if you look at the case involving Medicare regulations, this wasn't classified either, but it raised the same types of concerns of circumvention of law. I'm very concerned about the national security aspect of this, which is I think we're all concerned about national security. We're all concerned about the possibility of a terrorist attack. And I'm trying to figure out if this is a genuine concern, why this is not classified. That is to say, if you've got non-security cleared Navy personnel, swabby, walking in and out of that all the time, going out and drinking at the bars, and this is not classified information, if it's as dangerous as all of that, the Navy should be classifying this material and making sure these guys have security clearances. I don't get it. Well, I would respectfully disagree. In the context of the work that one does with this type of material, when an architect, for instance, is trying to design a building and you've hired him from the outside world to bring in and take a look at this, you have to get him classified. There's a lot of logistical difficulty that is involved if you are required to classify material. I understand that perfectly. But what I'm trying to say is I'm trying to assess realistically the level of danger of having this information available to bad people. And I've got an intellectual disconnect between the statement that it's very dangerous to allow people to know where the Tomahawk missiles are stored with the simultaneous statement is that it's not classified information and that anybody who walks on that base and finds out where they are, they can walk right off the base and have a conversation in the local bar with whoever the local terrorist is and say, well, you know where the Tomahawk missiles are? They're in Building A. So there's something that doesn't fit very well between it's dangerous for that knowledge to be out there, but we don't classify it. Well, but in the context of the management of sensitive information, which is really what the FOIA is all about, there are lots of types of information that are sensitive that need the FOIA exemptions, but they simply don't rise to the expense and the burden of actually having to shut it down. Is there anything in the record that tells us from the Navy's side to support its statement that this is dangerous, that they instruct Naval personnel not to tell people outside the base where these are stored? It's not the question of storage. It's also the question of the chain reaction types of things that you're getting into. You didn't answer my question. Does the Navy put anything in the record that tells us, for example, that it has told Naval personnel on the base not to tell anyone outside the Navy or on a need-to-know basis don't tell anybody where the Tomahawk missiles are stored or the other dangerous munitions are stored? The record is silent on that. However, I would point to the affidavit by Smith, which is at SER 40, where when the map that was disclosed was provided to the local community, he explained that it was confidential. Naval personnel are, obviously, it's a matter of general knowledge, that Naval personnel are aware of the sensitivity of information that is involved with the management of storage of high explosives, and they're going to be using and they're probably trained to use some discretion in how they talk about it. But that is not in the record. I was going to say, you're using probably as I'm telling you. That's right. We're not in the record, Your Honor, and the record is silent on that point. And the Navy easily could have done this. They could have told us that we are very concerned about this and here are the measures we've taken. It's difficult for us to do a classified. Well, that is in the record. I understand, but they've not said, and because we're so worried about this, here are the measures that we have taken. They've not put that in. Well, there's a fairly extensive description by Commander Whitbread of the Navy's security procedures with respect to the handling of explosives. Okay. I think one can draw an inference that they take it seriously and they're not calling up the Seattle Times and telling them this information. Yeah. Yeah, yeah. Before you say that, I want to make sure there are no other questions from the bench. I have none. Thank you. Okay. Thank you. Why don't we give you a couple of minutes to respond. I'll keep it really brief. My mission at UTS is as a paramedic and an emergency responder is a broad category. We're not just talking firefighters. It's police, utility workers, electrical workers, parking enforcement. We understand. It's people with a need to know. And the question is, does the sharing of information with people who need to know it somehow waive the sensitivity of the information and make it fully disclosable in response to a FOIA request? It indicates that it is not an internal personnel rule of practice. And if ATF goes on a raid with the Seattle Police Department and the King County Sheriff's Office, they're going to share raid procedure information so that people don't shoot one another in the course of executing the warrant. That doesn't mean that it is not sensitive information. But the question isn't whether it's sensitive. If it needs to be classified, if it's a risk, why are we giving it to ATF? We said that information can't be shared because we don't want to have the people who may be the subject of the raid know what procedures are going to be followed when we execute the warrant. How is this any different? It is not an internal personnel rule of practice. It may be a national security issue, but that's Exemption 1. And I'd like to point out that Mr. Milner has these maps from the submarine base. So not every commander agrees with Commander Whitbread in this case that these maps present the risk that the government wants you to believe in. He has the ARC maps from Bangor? Yeah. And those were given to him under FOIA? That's correct. And what's stored at Bangor that's different from what's stored at Port Townsend? I don't know. Bangor has nuclear missiles. It's my understanding we do not have the ARC maps for those. The commander at Indian Island's explanation of why there's a difference is that he doesn't know why the submarine base commander gave it out. He's not a submarine base commander. He doesn't know why there are separate reasons. The best the government could do is there's a no-fly zone over Bangor. Suggesting that it may be more sensitive. It's a suggestion that it's maybe more sensitive. Right. And the idea that the no-fly zone somehow immunizes Bangor from terrorist attacks. I thought the government's brief said, or tried to explain that discrepancy. They're saying that Bangor had other security measures so they'd be less vulnerable if somebody got those maps. Because of their other security. If there are better defenses at Bangor, then those should be at Indian Island. And Mr. Milner should know how far the blast is going to go. I've been on Bangor, and there are parts of Bangor that you don't go without being shot on sight. So I don't think that the magazine depot has quite that level of security, but maybe it does. But the point is that we don't want to share that information with people who might have evil intent. Then classify it. Because you're sharing it with parking enforcement officers who are not screened. We don't know where they are. We have no idea who they are other than the fact that they're employed by a threat responder. I still don't. I guess I'm having a hard time making the leap that then entitles your client to have it. I mean, at some point the Navy gets to decide who needs it and who doesn't. And that doesn't necessarily amount to a waiver of its sensitivity. No. And we're not arguing waiver. We're arguing that the Navy has to follow the law. That this has to fit within an exemption. And it fits within Exemption 1, but the Navy hasn't chosen to put it there. It does not fit within Exemption 2. Last comment has to do with Crooker. Crooker was about ATF training manuals. And no circuit has held that you can write out the word personnel. The Navy has tried to get around that by arguing essentially that personnel means what our people use. But that's everything. And what we end up with if we have that definition is we're allowing the Navy to decide, without reference to FOIA, what can and can't be released. That's pre-FOIA. And that's why we're asking the question. So the centerpiece of that argument is that personnel just can't be extended to what's going on here. Quite aside from danger, quite aside from all these other things, personnel doesn't mean where you store your ammunition. That's right. Personnel doesn't mean the blast map. We're not even asking for where the ammunition is stored. We're asking for how far the explosion goes. And personnel, in your view, is like an instruction manual to a person. It is something that relates to a person. That's exactly right. This may fit in Exemption 1. It does not fit within the exemption the Navy claims. We're therefore asking for the documents to be released. Okay, thank you. Thank you. I want to thank both sides for the very good arguments on both sides. The case of Milner v. United States Department of the Navy is now submitted for decision.
judges: Fletcher, Gould, Tallman